C. H. CUTTS v. S. WORTH (WIRT) CASEY AND WIFE, MARTHA B. CASEY

No. 4

(Filed 19 November 1969)

1. Trial § 58;    Judgments § 2—    waiver of jury trial — filing of judgment

When a jury trial is waived the judge must give his decision in writing, stating his findings of fact and conclusions of law separately, and absent consent of the parties the judgment must be filed with the clerk during the session at which the trial takes place. G.S. 1-185.

2. Judgments § 2—    judgment out of session and out of county — authority of court

In this action of trespass to try title, the trial judge announced at the conclusion of all the evidence that "I am going to find that the defendant is entitled to his 53 poles and the plaintiff is entitled to the balance," and instructed plaintiff's counsel to draw a judgment finding specific facts in accordance with his decision. The parties stipulated that the judgment could be signed at the next criminal session of another county. When called upon to sign the judgment tendered by plaintiff's counsel, the judge stated that he had reconsidered the case and changed his mind, and signed a judgment prepared by counsel for defendants adjudicating that defendants are the owners of the premises described in the answer: *Held:* The stipulation did not limit the trial judge to any particular decision, and the judge had authority to make findings of fact, conclusions of law and render judgment in favor of defendant at the next criminal session of the stipulated county.

3. Boundaries § 2—    monuments — established line of another tract

An established line of another tract is a fixed monument.

4. Boundaries § 2—    distance between fixed monuments — distance called for in deed

The actual distance between fixed monuments will control over a conflicting distance called for in the deed.

5. Boundaries § 15;    Trespass to Try Title § 4—    ownership of land — findings as to disputed boundaries

In this action in trespass to try title to land claimed by plaintiff and defendants from a common source, an 1859 grant, wherein the location of the southwest line of this grant and the location of an 1879 conveyance of a portion of this grant are in dispute, findings of fact by the court were insufficient to support the court's conclusion that defendants are the owners of the lands and premises described in the answer, where the court failed to make findings specifically locating the disputed boundary lines of the 1859 grant and of the 1879 conveyance.

APPEAL by plaintiff from *Bundy, J.,* 30 September 1968 Civil Session of PENDER. Upon plaintiff's petition for certiorari this case

was certified for review before determination by the Court of Appeals.

In this action for trespass plaintiff seeks (1) an adjudication that he is the owner and entitled to the immediate possession of the land described in the complaint, 2.8 acres on Topsail Beach, being lot No. 3 of the division of the lands of Jesse W. Batson, deceased; (2) an order permanently restraining defendants from trespassing upon the premises; and (3) damages for trespass. Defendants deny that plaintiff owns the lands described in the complaint. They allege that they own the lands described in the answer, lot No. 1 of the subdivision of lot No. 3 of the Millie Bishop estate. They pray that they be declared the owners and entitled to the possession of these premises, that plaintiff be permanently restrained from trespassing thereon, and that they recover of plaintiff damages for trespass.

The case was first heard by a referee in October 1965. His findings of fact, conclusions of law, and decision, filed 8 June 1966, were in favor of defendants. Plaintiff filed exceptions to the referee's report, submitted proposed findings of fact, tendered issues, and demanded a jury trial. At the October 1966 Session, the case was heard by Fountain, J., and a jury. At the conclusion of plaintiff's evidence, Judge Fountain allowed defendants' motion for nonsuit and then declared a mistrial as to defendants' cross action. Plaintiff appealed and, at the Spring Term 1967, we reversed the judgment of nonsuit. See the opinion by Parker, C.J., in *Cutts v. Casey*, 271 N.C. 165, 155 S.E. 2d 519, for a more detailed exposition of the pleadings and a preliminary statement of plaintiff's evidence.

At the 30 September 1968 Session the parties waived a jury trial, and Judge Bundy heard the cause upon the transcript of the evidence which plaintiff and defendants had offered before the referee. At the conclusion of all the evidence, Judge Bundy announced his decision as follows: "I am going to find that the defendant is entitled to his 53 poles; and the plaintiff is entitled to the balance." At the time of making this statement he pointed to defendants' Exhibit 12, the Utley map, which showed the Batson grant to be the area lying between the lines A-B-C, C-D, D-E, and E-A. He instructed Mr. Rountree, counsel for plaintiff, to draw a judgment finding specific facts in accordance with his decision.

In open court it was agreed by the parties that the judgment could be signed at the next Criminal Term of New Hanover. On 1 November 1968 counsel appeared before Judge Bundy in Wilmington. When plaintiff's counsel tendered judgment prepared in

accordance with their understanding of the court's instructions, Judge Bundy announced that he had reconsidered the case and changed his mind, and had instructed counsel for defendants to prepare the judgment for his signature. He then signed the judgment of record, which adjudicates that defendants are the owners of the premises described in the answer. Plaintiff appealed, assigning as error (1) the judge's refusal to make the findings of fact set forth in plaintiff's proffered judgment, (2) his refusal to enter judgment in accordance with his statement made at the conclusion of the trial at the September 1968 Session in Pender, and (3) his entry of judgment decreeing that defendants owned the property described in the answer.

*Wyatt E. Blake and George Rountree, Jr., for plaintiff-appellant.*

*Corbett & Fisler for defendant appellees.*

SHARP, J.

This appeal presents two questions: (1) Did Judge Bundy have authority to render judgment in this case in New Hanover County on 1 November 1968 and (2) if so, do the facts he found support the judgment he signed.

**[1, 2]**    When a jury trial is waived the judge must give his decision in writing, stating his findings of fact and conclusions of law separately. Absent consent of the parties the judgment must be filed with the clerk during the session at which the trial takes place. G.S. 1-185. It appears of record that all parties agreed that the judgment in this case "could be signed at the next criminal term in Wilmington." Plaintiff contends, however, that the parties' agreement did not authorize the judge to sign, out of session and out of county, "the particular judgment" he rendered; that he was only authorized to sign a judgment in accordance with his announced decision; and that "this case should be reversed and remanded to the Superior Court of Pender County with directions to enter judgment on behalf of the plaintiff as proposed in the unsigned judgment of record," *i.e.*, the judgment tendered by plaintiff's counsel. The inappropriateness of this contention — and the impossibility of drafting a judgment upon the judge's cryptic statement "I am going to hold that the defendant is entitled to his 53 poles and the plaintiff is entitled to the balance" — will appear as the evidence is hereinafter developed. For now it suffices to say that the parties did not attempt thus to circumscribe Judge Bundy's authority. The stipulation did not limit him to any specific decision, announced or unannounced.

When, at the end of the trial, he made the statement upon which plaintiff places his reliance he had neither filed with the clerk nor dictated into the record findings of fact which would control his judgment. When he adjourned the court, he left in Pender County no findings of fact constituting a judicial "verdict" which would support any judgment.

In a land suit as complicated as this one the parties had every reason to anticipate that any findings of fact prepared by either party would "bring on more talk." According to the judge's statement to counsel in Wilmington, after leaving Pender County, and upon further consideration of the case, he changed his mind and requested the attorney for defendants to prepare a judgment different from that which plaintiff's attorney understood he was to draw. There is nothing in the record which suggests that before changing his mind he had conducted any one-sided hearing from which plaintiff's counsel were excluded. Upon the authority of *Dellinger v. Clark,* 234 N.C. 419, 67 S.E. 2d 448, a case involving a situation strikingly similar to the one here, we hold that Judge Bundy had authority to make his findings of fact, conclusions of law, and render judgment in New Hanover County at the next criminal term of court.

Adjudication of the second question requires consideration of the evidence. Plaintiff and defendants claim from a common source, a grant "for 51 acres of land" on Topsail Banks in Pender County (then New Hanover), made 20 April 1859 by the State of North Carolina to Jesse W. Batson. This grant began at a stake, William B. Sidberry's corner on the sound, and ran with Sidberry's line across the banks S. 25° E. 66 poles to a stake at the edge of the ocean; thence with the edge of the ocean N. 53° E. 107 poles to Frederick Rhue's line; thence with Rhue's line N. 25° W. 88 poles to Crooked Creek; thence with the creek to the beginning. Thus, the Batson grant called for a quadrangular-shaped tract lying between the lands of Rhue and Sidberry and between two natural boundaries, Crooked Creek and the Atlantic Ocean. Frederick Rhue and William B. Sidberry also acquired their lands by grant from the State of North Carolina. The Sidberry grant was dated 4 January 1845; the Rhue grant, 18 November 1854.

[3]    The location of the Rhue line (Batson's northeastern boundary) is not in controversy. It begins "at a stake at Cockle or Crooked Creek Landing on the sound side, then South 35° E. 92 poles to the ocean." It is well known and established on the ground. Thus, it is a fixed monument, *Batson v. Bell,* 249 N.C. 718, 107 S.E. 2d 562.

The parties dispute the location of the Sidberry line which must be located before the Batson grant can be defined.

The Sidberry grant purported to convey 170 acres between Topsail and Stump Inlets. It is described as beginning "on a dead cedar at the east end of a hammock near Cockle Creek Pond; thence S. 23° E. 50 poles to a stake; thence S. 50° W. for 260 poles at a stake between the Hammock and the Atlantic; thence N. 23° W. 160 poles to a stake in the sound; thence to the beginning." The evidence tends to show that Sidberry also owned other lands in the vicinity.

In March 1861 the lands of William B. Sidberry, deceased, were divided. In the division his daughter, Vashti Atkinson, received three tracts totaling 239 acres. One tract, containing 55 acres, was described as beginning on a dead cedar, running thence S. 23° E. 125 poles to a stake; thence N. 23° W. 100 poles to a stake on the sound; thence to the beginning.

On 1 August 1879, Jesse W. Batson conveyed approximately half of the lands described in his grant to Millie Bishop. The deed described the land as lying on Topsail Banks and beginning at a stake, Vashti Atkinson's corner in the sound; thence with her line across the banks S. 25° E. 66 poles to the ocean; thence with the edge of the ocean, N. 53° E. 53 poles (874.5 feet) to a stake; thence N. 25° W. 88 poles to the sound; thence with the meanders of the sound to the beginning. This deed is the foundation of defendant's claim, and the location of Vashti Atkinson's corner is the major problem in this case.

Plaintiff's evidence tended to show that the northeastern line of the Sidberry tract and of the Vashti Atkinson tract were one and the same. If so, Batson conveyed to Millie Bishop the southern half of his grant as plaintiff contends, and not the northern portion as defendants contend. On the basis of the description in his grant — which called for an ocean frontage of 107 poles (1765.5 feet) — Batson would have retained a tract fronting 54 poles (891 feet) on the Atlantic Ocean. However, on the basis of the survey upon which plaintiff relies, he contends that Batson actually retained 2574 feet.

On 21 January 1956 a petition was filed by heirs of Jesse W. Batson and S. G. Blake, the grantee of some of the heirs, to partition that portion of Batson's grant which remained after his conveyance to Bishop. Commissioners were appointed, and they employed a surveyor, Raymond Price, to locate and divide the land which Batson had retained. On 2 June 1956 the commissioners filed their report showing a division of the property into twelve lots. The

map of this division is plaintiff's Exhibit F (also marked defendants' Exhibit 5). The Clerk of the Superior Court approved the report on 13 June 1956, and it was recorded on 9 July 1956.

In the Sidberry grant, the beginning point was designated as a dead cedar as was the beginning point in the 55-acre tract allotted to Vashti Atkinson in the division of his estate. According to plaintiff's evidence, in May 1956 the site of the dead cedar was marked by an old lightwood knot of indefinite age. Price testified that it could have been there "one year or fifty," that he found it implanted in the marsh approximately 300 feet from the northeast end of Horse Hammock, which was at the end of Cockle Creek Pond. The knot is designated by the letter A on plaintiff's Exhibit F. There were several cedar stumps in the area but none within 200 feet of the lightwood knot. Approximately 300 feet southeast of it in the line A-B (Exhibit F) is an old cedar snag in a hammock.

In making his survey for the Batson division, Price began at this lightwood knot. From it, he ran the first two calls in the Sidberry grant, lines A-E and E-F (Exhibit F). At the end of the second call (line E-F) he came to an old marked line, the third call (line F-G), which took him to the sound. Beginning at Point A, Price also ran the southwest line of the Batson grant (line A-B). He ran with the Sidberry grant for 50 poles (Point E) and then continued the same course for 16 poles (thus running the 66 poles called for in the Batson grant) to the ocean, the end of the first call (Point B). He then ran the second call (B-C), "thence with the ocean N. 53° E. 107 poles (1765.5 feet) to Rhue's line." However, to get from Point B, Sidberry's line extended, to Rhue's established line, Point C, he had to go 211 poles (3448.5 feet) instead of the 107 poles (1765.5 feet) called for in the grant.

Price testified that in making the division among the Batson heirs he showed on Exhibit F what he found on the ground. It appears that he laid off the Millie Bishop tract by treating Point A as Vashti Atkinson's corner and surveying from there in accordance with the calls in the deed from Batson to Bishop. From Point B he ran 53 poles (874.5 feet) along the edge of the ocean. He then turned N. 18° W. to the sound and from there to the beginning. After thus defining the Millie Bishop tract, between its northeast line and the Rhue line, there remained 2574 feet of ocean frontage instead of 891 feet which would have been the remaining frontage had the entire distance been 107 poles as specified in the grant.

Beginning at the Rhue line Price divided this tract into twelve lots, the northeast line of lot No. 1 being the southwest line of the

Cutts *v.* Casey

Plf. Ex. "F"

PRICE MAP

OF TWO PAT. LOCATED IN TOPSAIL TOWNSHIP PENDER COUNTY N.C. BETWEEN SURF CITY & TOPSAIL INLET. ALL COURSES MAGNETIC AS OF MAY 30, 1956. SCALE 1"=600'

CUTTS *v.* CASEY

MAP

SHOWING THE DIVISION OF THE
MILLIE BISHOP ESTATE SITUATED
IN PENDER CO., N.C. BETWEEN
THE ONSLOW-PENDER LINE OF
TOPSAIL INLET. SURVEYED DEC.
1946 BY R.E. KOOVCS ENGINEER.

Def. Ex. #3

CUTTS *v.* CASEY

Rhue grant. In the division, the heirs of Levi Batson, a son of Jesse W. Batson, were assigned lot No. 3. On 6 October 1964, in a deed containing no warranties, they conveyed lot No. 3 to C. H. Cutts, the plaintiff herein. Lot No. 3 of the Batson partition, as described in the report, begins at a stake in the edge of the ocean, the southwest corner of lot No. 2. This beginning point is 758 feet from the Rhue line and 2690.5 feet from the line A-B, William Sidberry's line, as established by Price. From the southwest corner of lot No. 2, lot No. 3 runs S. 56° 30′ W. with the edge of the ocean 156 feet to the southwest corner of lot No. 3; thence with that line N. 27° 20′ W. in the sound; thence northeasterly with the sound to the northeast corner of lot No. 2; thence with that line S. 28° 20′ E. to the beginning.

The area in dispute between plaintiff and defendants is the northeast portion of lot No. 3 of the Price division. Defendants claim a quadrangle measuring 80 X 280 X 180 X 80 feet, which is designated by the lines 3-6, 6-5, 5-2, and 2-3 on the court map.

[4]    From plaintiff's evidence, it is quite clear that one of two surveying errors has been made — either the surveyor of New Hanover County made a mistake of 104 poles in 1858 when he measured the distance between the Sidberry and Rhue grants, the second call in the Batson grant, or Surveyor Price mislocated the northeast line of the William B. Sidberry grant (the line A-B) in May 1956 because lot No. 3 of the Batson division is more than 1765.5 feet (107 poles) from that line. If plaintiff establishes the line A-B as the Sidberry line the actual distance between it and Rhue's established line (fixed monuments) will control and not the distance of 107 poles called for in the grant. *Cutts v. Casey*, 271 N.C. 165, 155 S.E. 2d 519.

To summarize:  Plaintiff claims record title to the land in dispute through the following instruments: (a) Grant from the State of North Carolina to Jesse W. Batson; (b) Division by special proceeding of the lands of Jesse W. Batson, deceased; (c) Deed from Batson heirs to Charles H. Cutts.

Defendants claim record title to the disputed area through the following instruments: (a) The Jesse W. Batson grant (the parties' common source); (b) Deed from Jesse W. Batson to Millie Bishop; (c) Partition deed, dated 4 March 1947, to Nancy I. Batts, Thelma Batts, Norman Batts, and J. P. Batts (heirs of Millie Bishop) from the remaining heirs of Millie Bishop, for lot No. 3 (8.9 acres) of the "Division of the Millie Bishop Estate" as shown by the plat recorded in Plat Book 3, page 36, Pender County Registry, defendants' Exhibit 3; (d) and (e) Two deeds, dated 21 February 1956

and 3 December 1956 respectively, from the grantees (or their heirs) in Link (c) above to defendant, Martha B. Casey, to lot No. 1 of the subdivision of lot No. 3 of the Millie Bishop division.

Defendants contend they have sufficiently established their claim to the disputed area if they can show that Rhue's southwest line and Bishop's northeast line were the same.

The division shown on defendants' Exhibit 3, which defendants assert was of the Millie Bishop tract, was made in December 1946 by Koontz, surveyor, upon the assumption that the northeastern line of the Millie Bishop tract (lot No. 1) was the southwestern line of the Rhue grant. Defendants' Exhibit 3 shows this line to begin at an iron pipe on Cockle Creek Landing and to run S. 32° 1000 feet to the Atlantic Ocean. Plaintiff stipulated that this line was the Rhue line. From the terminus of this line Koontz ran S. 57° 30′ W. 955.8 feet with the ocean and then turned N. 70° W. 1871 feet to Topsail Sound; thence northeasterly to the beginning. The map shows that 51.32 acres were divided into six lots.

According to the Koontz map the southeastern corner of lot No. 3, measured along the ocean, is 318.6 feet from the Rhue line; the southwest corner, 477.9 feet. The northeast line runs N. 46° 15′ W. 1550 feet from the ocean to the sound; the southwest line, N. 52° 30′ W. 1540 feet. The ocean frontage between the two lines is shown to be 159.3 feet. The court map, prepared by J. W. Blanchard in December 1956 to illustrate the contentions of the parties, shows the southeast corner of lot No. 3 to be 470 feet from the old Rhue line.

In June 1954, William W. Blanchard, a surveyor, basing his work entirely on the Koontz map, divided lot No. 3 into three lots. The map of this subdivision is defendants' Exhibit No. 10 (not reproduced herein). Lot No. 1, to which defendant Martha B. Casey claims record title, is the southernmost lot of this subdivision. The subdivision map shows a frontage of 57.23 feet on the ocean. The call in one of her deeds is for "about 50 feet" along the ocean; the description in the other is merely "Lot No. 1 as shown by the W. W. Blanchard map of the Mrs. Nan Batts Heirs Subdivision." The southwest line of lot No. 1 of the Batts Heirs Subdivision, also the southwest line of original lot No. 3 of the Millie Bishop Division, runs N. 52° 30′ W. from the ocean to the sound; the northeast line runs N. 50° 31′ W.  Blanchard testified that this lot No. 1 is contained within the bounds of lot No. 3 of the Koontz division. He also testified that no call in the deed to Bishop from Batson (1879) could conform to the Koontz division (1946), with the possible exception

of the ocean frontage, and that the third call in the deed bears no relation to the Rhue line.

In answer to a question based upon the assumption that the line A-B on the court map and the line C-D on plaintiff's Exhibit F (the southwestern line of the Rhue grant) was the third call in the Millie Bishop deed, and that the first call in that deed was parallel to the third call, W. W. Blanchard testified that in his opinion the disputed area was within the boundaries of the Millie Bishop deed as well as all of lot No. 3, except a small triangle in the southeast portion.

The Bishop deed does not refer to the Rhue line (S. 35° E. 92 poles), which defendants contend to be the third call in the Bishop deed (N. 25° W. 88 poles to the sound). Although the Bishop deed calls for Vashti Atkinson's corner as its beginning point, defendants offered no evidence tending to locate this point.

The testimony of defendants' witness W. H. Utley, a registered surveyor, stipulated to be an expert in surveying and forestry, tended to show:

In March 1957 he surveyed the Sidberry, Batson, and Rhue grants and made the map introduced in evidence as defendants' Exhibit 12. As a result of information he obtained from three elderly gentlemen of the vicinage, Daniel Justice, aged 80, Raleigh Clayton, 78, and Roland Batts, 60 (all of whom are now deceased), he located the beginning point in the Rhue grant at the iron (stake) on Cockle Creek Landing (Point E on Exhibit 12), and he also located Horse Hammock. The line E-D on Exhibit 12 is the line C-D on plaintiff's Exhibit F. On the east end of Horse Hammock at Point A he found a large cedar stump approximately three feet across at the root collar. This was the largest remains of a tree anywhere in the locality, and it was about 75 feet from the end of the hammock and the pond, which terminates Cockle Creek. There were a number of cedar stumps of varying sizes 30-50 feet away. The three elderly gentlemen also told Utley that the end of the hammock near Point A existed today as it always had.

Using the cedar stump as the beginning point of the William B. Sidberry grant he ran its first call 50 poles, or approximately 825 feet, to Point B. He then turned and ran the line B-F, the third call in the Sidberry grant 4290 feet. At Point F he turned N. 18° 45' W. (the 1957 bearing for the third call) and ran 2640 feet to Point G, which is the sound.

Utley next ran the Batson grant. Beginning at Point A he con-

tinued the line A-B to the present beach erosion line and then turned to run the second call in the Batson grant, to the Rhue line, E-D. He found that distance to be 1912 feet instead of the 1765.5 feet, or 107 poles called for in the grant, a discrepancy of 146.5 feet. Based upon information he received from the three old residents, his examination of the area, his survey of the lines in the Sidberry and Batson grants, the location of the cedar stump (the largest in the area) at the east end of a hammock near the end of Cockle Creek Pond, he was satisfied that Point A on Exhibit 12 was the only possible beginning point of the Batson grant.

When he made his survey in 1957, Utley found in the salt marsh the lightwood knot (which he called a large cedar limb) from which Price began his survey of the Batson grant. This point, A on plaintiff's Exhibit F, is designated (1) on defendants' Exhibit 12. When Utley pulled up the cedar limb for examination he found that it had "been sharpened off." It was his opinion that the tool marks on the tip were not more than six months old and that the matted marsh grass beneath the pole was the previous year's growth. It had not rotted or deteriorated. From the cedar limb he ran the line 1-2, the line shown on the Price map (Exhibit F) as A-B. In doing so, he followed the line which had been cut not more than two years before. From line 1-2 to the southwest edge of Cockle Creek Pond was approximately 2000 feet; from his Point A in the line A-C, it was about 75 feet.

Utley identified the line E-D on his map as being the northeast line of the Millie Bishop division as shown on defendants' Exhibit 3. In his opinion, lot No. 3 of that division lies within the bounds of the tracts A-C-D-E shown on his map (Exhibit 12). At the time he made his survey, one of his informants, Mr. Justice, told him that the land southwest of the Rhue line had always been known to him as the Millie Bishop land, but he did not know who the present owners were. Utley obtained no information as to the whereabouts of Vashti Atkinson's corner.

Several of the Millie Bishop descendants testified that 35-55 years ago an ancestor had told them that the Millie Bishop lands adjoined Rhue on the northeast. None had any information whatever as to the location of Vashti Atkinson's corner, the Sidberry lands, or the Batson grant. They knew only "where our property is," its location having been "determined by a registered surveyor."

From the evidence offered it appears that if Bishop's northeast line (the third call in her deed) was the Rhue line, the disputed land lies within the area covered by the deed under which defend-

.ants' claim, and plaintiff cannot win. In this event, however, it would seem that other portions of the Millie Bishop division south of lot 3 would overlap land retained by Batson.

If Bishop's southwest line was the northeast line of the Sidberry grant, line A-B-C as shown on Exhibit F and line 1-2 as shown on Exhibit 12, defendants' land lies outside the boundaries described in the deed from Batson to Bishop, and plaintiff must win.

There remains the possibility that Bishop's southwest line was the Sidberry line but that its correct location is the line A-B-C as shown on defendants' Exhibit 12 and that the Bishop lands are shown by the lines A-B-C, C-X, X-Y, and Y-A. Neither party tried the case upon this theory. However, it cannot be disregarded since there is substantial evidence tending to show that Point A on the Utley map is the beginning point of the Batson grant. If the Bishop lands do lie within the lines specified above, it is not clear to us from the evidence whether any part of lot No. 3 as laid off by Price encroaches upon the Bishop tract. It is certain, however, that many of the other lots shown on Exhibit F would.

From the foregoing it is clear that the judge's statement made at the conclusion of the evidence afforded no basis for a decision of the case. He did not indicate where he was locating the line from which he would measure the 53 poles called for in the deed from Batson to Bishop. Nor did he indicate the course the line would run from the ocean to the sound. There being no line in the Bishop deed which would correspond to the Koontz division of the Bishop lands except the one along the ocean, the courses of the other lines are important.

The interpretation which counsel for plaintiff gave Judge Bundy's pronouncement is disclosed by their tendered judgment which contained in substance the following: (1) Batson conveyed the southern portion of his grant to Bishop, described with reference to the Utley map as being within the lines A-B-C, C-X, X-Y, and Y-A. (2) Batson died intestate owning the balance of his grant, a tract fronting 891 feet on the ocean and lying between the Rhue line (D-E) and the northeast line of the Bishop lands (X-Y). (3) The heirs of Millie Bishop attempted to divide the entire Batson grant as shown by the Utley map instead of the southern portion measured 53 poles (874.5 feet) from the Sidberry line as shown by Utley. (4) The heirs of Batson have attempted to locate the Bishop lands by measuring 53 poles from the line 1-2 on the Utley map and then to divide the lands between there and the Rhue line (E-D). They did not own the land lying between the line 1-2 and the line A-B-C on

that map. (5) Plaintiff owns all of lot 3 as shown on the court map except a strip approximately 23 feet wide described with reference to the court map as lying between the line F-G and a line running from Point 3 S. 27° 20′ E. to the ocean, and it is not clear who owns this strip. Upon these findings plaintiff tendered judgment that plaintiff owned all of lot 3 (Exhibit F) except that portion of lot No. 3 described above.

Obviously it cannot be demonstrated that the judgment which plaintiff tendered incorporated the finding which Judge Bundy said he intended to make or that it decreed the division he had in mind! The judgment which he signed is summarized as follows:

(1) Plaintiff and defendants claim title from a common source, the Batson grant.

(2) Batson conveyed to Bishop "the lands purported to be contained within the Millie Bishop division and reflected on map in Map Book 3 at page 36, Pender County Registry."

(3) The Batson grant was bounded on the northeast by the Rhue grant, on the southwest by the Sidberry grant.

(4) Plaintiff has failed to show title either by record or possession to the land described in the complaint or to any part of the lands described in the answer.

(5) Defendants are the owners and entitled to the possession of the lands described in the answer.

(6) There is no evidence that either party sustained any damage as the result of trespass by the other.

Upon the facts he adjudged that defendants are the owners of the lands and premises described in the answer.

[5] The foregoing facts are not sufficient to support the conclusions Judge Bundy reached. It is quite true — as the court found in (2) — that the heirs of Millie Bishop *purported* to divide the lands described in her deed. The question is whether they *did* divide the land Batson conveyed to her. It is also quite true that the Batson grant was bounded by the Atlantic Ocean, Topsail Sound, the Rhue grant and the Sidberry grant. All the boundaries are known except the Sidberry line, which the judge did not specifically locate. The deed to Bishop did not convey the entire Batson grant to her. Therefore, both the northeast and the southwest lines of the Bishop lands must be located in order to determine the rights of the parties.

As stated, finding (4) amounts to a conclusion of law that plain-

tiff offered *no* evidence tending to establish his title to the lot described in the complaint. On the first appeal of this case, *Cutts v. Casey, supra,* in overruling the judgment of nonsuit, we held that there was some evidence from which the jury could find (1) that plaintiff acquired the land in controversy "through a connected chain of title," and (2) that the disputed area was a part of the land which descended to the Batson heirs. Of course, the credibility of the testimony of all the witnesses who testified was for the judge, who was sitting as a jury.

We deem it appropriate to note that the assignments of error question none of the court's rulings upon the competency of any evidence which was admitted.

The judgment of Bundy, J., is vacated and the case remanded to the Superior Court for a

New trial.